# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **ELIZABETH LOMAX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:12cv1275 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Elizabeth Lomax (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. Plaintiff has filed a brief in support of her complaint, the Commissioner has filed a brief in support of her answer.[1]

## Procedural History

Plaintiff applied for DIB and SSI in September 2009, alleging a disability as of November 30, 2008, caused by anxiety disorder, manic depression, diverticulitis, sciatic

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

nerve problems, brain injuries, and memory loss. (R.[2] at 59-69, 253.) Her applications were denied initially and after a hearing held in June 2010 before Administrative Law Judge (ALJ) Victor L. Horton. (Id. at 9-23, 28-91, 98-105.) The Appeals Council denied her request for review, effectively adopting the ALJ's decision as the decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Delores E. Gonzalez, M.Ed., V.R.C.,[3] testified at the administrative hearing.

Plaintiff testified that she was then thirty-three years old, is a widow, and lives with her daughters, ages fourteen and eleven. (Id. at 36.) Her mother and stepfather help her. (Id. at 58.) Her daughters help with the cooking and washing the dishes. (Id. at 59.) They bring her the laundry, and she folds it. (Id. at 59-60.) She does not vacuum or do yard work. (Id. at 60.) She is 5 feet 5 inches tall and weighs 175 pounds. (Id. at 37.) She has less than one full year of college. (Id.)

Plaintiff has difficulty concentrating when she reads. (Id. at 38.) She can do simple arithmetic and write. (Id. at 39.)

---

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

[3]Vocational Rehabilitation Counselor.

Plaintiff spent time in jail on a driving underneath the influence charge and possession of marijuana charge. (Id. at 39-40.) The marijuana belonged to a friend who had left it in the glove compartment of her car. (Id. at 40.)

Plaintiff has recently been placed on Medicaid.[4] (Id. at 42.)

She last worked in June 2009 making telephone calls to update client information for an attorney. (Id. at 42.) This job was for six hours a day, four days a week. (Id. at 43.) It was a temporary job. (Id.) Before that, she worked in sales for a telecommunications company, as a receptionist for McDonald Douglas Company, as a cashier for a grocer and a restaurant, and as a line cook for a fast-food restaurant. (Id. at 46, 48, 49-51.)

Plaintiff testified that she has had two injections in her back, but they have not given her much relief. (Id. at 53-54.) Mental issues also prevent her from working. (Id. at 55.) She has a brain injury caused by a 2005 car accident, post-traumatic stress syndrome caused by finding her husband's body after he committed suicide, bipolar disorder, and depression. (Id. at 55, 57, 68.) She is seeing a psychiatrist, Dr. Asher, every two weeks and a counselor every two to three weeks. (Id. at 56-57, 64.) She is taking medications; her physicians are trying to get them stable. (Id. at 58, 68-69.)

Plaintiff further testified that she is supposed to help at her daughters' Catholic school in lieu of paying tuition, but has not been able to; she is working with the school to try to get

---

[4]Plaintiff was approved for Medicaid two weeks before the hearing. (Id. at 198.)

the requirement waived.  (<u>Id.</u> at 61-62.)  She goes to church whenever she can get a ride.  (<u>Id.</u> at 62.)

During manic episodes, Plaintiff has charged casino debts to her mother's credit card and used her rent money at casinos.  (<u>Id.</u> at 64-67.)  Her longest manic episode lasted weeks. (<u>Id.</u> at 73.)  She has crying spells every day.  (<u>Id.</u> at 68.)  Stress causes panic attacks.  (<u>Id.</u> at 75.)

Plaintiff cannot walk very far before having to stop and rest; cannot stand for longer than fifteen minutes; and cannot sit for longer than forty minutes.  (<u>Id.</u> at 70.)  The heaviest item she can lift is a gallon of milk.  (<u>Id.</u> at 71.)  She does not carry groceries.  (<u>Id.</u>)  Standing and walking up and down stairs aggravate her back pain.  (<u>Id.</u> at 73.)  She sleeps most of the day.  (<u>Id.</u> at 70.)  Her daughters get themselves to school in the morning.  (<u>Id.</u> at 71.) Because of the medication she takes at night, she is groggy in the morning.  (<u>Id.</u> at 78.)

Her last flare-up of diverticulitis was in October.  (<u>Id.</u> at 77.)

Ms. Gonzalez testified without objection as a vocational expert (VE).  (<u>Id.</u> at 80-89.) She was asked by the ALJ to assume a hypothetical claimant of Plaintiff's age, education, and work experience who is limited to light work with additional restrictions of occasionally stooping, kneeling, crouching, crawling, and climbing stairs and ramps; understanding, remembering, and carrying out at least simple, non-detailed instructions; demonstrating adequate judgment to make simple, work-related decisions; performing repetitive work according to set procedure, sequence, and pace; and never climbing ropes, ladders, and scaffolds.  (<u>Id.</u> at 83-84.)  Ms. Gonzalez testified that this hypothetical claimant can perform

Plaintiff's past relevant work as a fast food worker, cashier, and convenience store clerk.  (Id. at 84.)

A second hypothetical was then posed.  (Id. at 85.)  This claimant can understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for two-hour segments during an eight-hour day; respond appropriately to supervisors and co-workers in a task-oriented setting with infrequent and casual contact with others; and perform repetitive work according to set procedure, sequence, and pace.  (Id.)  Ms. Gonzalez testified that this person will not be able to perform the past relevant work the first hypothetical person can perform.  (Id.)  She can perform jobs as a hand presser and bench assembler.  (Id.)  These both are light, unskilled jobs and exist in significant numbers in the local and national economies.  (Id.)

A third hypothetical claimant was described who also needs a sit-stand option with the ability to change positions frequently.  (Id. at 86.)  Ms. Gonzalez testified that this claimant can still perform the job of a bench assembler and can also work as a polisher, which is a sedentary, unskilled job.  (Id.)

A fourth hypothetical claimant has daily crying spells which will take her and her co-workers off-task.  (Id. at 87.)  There are no jobs this claimant can perform.  (Id.)  Nor are there any jobs that can be performed by a fifth hypothetical claimant who has no ability to relate to co-workers, interact with supervisors, handle work stresses, and be reliable.  (Id. at 89.)

Ms. Gonzalez stated that her testimony is consistent with the *Dictionary of Occupational Titles* (DOT). (Id. at 89.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and assessments of her physical and mental residual functional capacities.

When applying for DIB and SSI, Plaintiff completed a Disability Report.[5] (Id. at 252-61.) She was then 5 feet 4 inches tall and weighed 170 pounds. (Id. at 252.) Her impairments, see pages one to two, supra, limit her ability to work by causing her memory problems, back and knee pain, intestinal problems, constant crying spells, shortness of breath, and occasional fear of leaving home. (Id. at 253.) The impairments first bothered her on June 2005 and prevented her from working as of November 30, 2008. (Id.) She had tried to continue to working, but had to stop on June 30, 2009. (Id.)

Plaintiff disclosed on a Function Report that she cannot stop crying if she has a bad night. (Id. at 262-69.) She normally sleeps during the day while her children are at school. (Id. at 262.) Her parents and people in her children's school help her. (Id. at 263.) If she sleeps, it is fitful. (Id.) The only meals she prepares are from frozen dinners and canned

---

[5]Plaintiff had previously applied for DIB and SSI, but had not pursued the applications after they were initially denied in 1995. (Id. at 248-49.)

goods.  (Id. at 264.)  Her mother cleans her house.  (Id.)  She does not do any yard work; her stepfather does it.  (Id. at 264-65.)  She only goes outside if necessary.  (Id. at 265.)  She does not have any hobbies.  (Id. at 266.)  On a regular basis, she picks up her children from their school.  (Id.)  Sometimes, she goes to church.  (Id.)  Her impairments adversely affect her abilities to lift, bend, squat, stand, walk, sit, talk, climb stairs, remember, complete tasks, concentrate, understand, and follow instructions.  (Id. at 267.)  She can only lift approximately five pounds.  (Id.)  She can walk one block before having to stop and rest.  (Id.)  She cannot pay attention for long.  (Id.)  Spoken instructions have to be repeated.  (Id.)  She does not handle stress or changes in routine well.  (Id. at 268.)  She is afraid to go outside.  (Id.)

Plaintiff's mother, Kathy Meister, completed a Function Report on her daughter's behalf.  (Id. at 230-37.)  She and her husband stay with Plaintiff at least three to four nights a week to help with her children and to help her get around.  (Id. at 230.)  Ms. Meister reported that Plaintiff has a hard time, has a lot of anxiety, will break down and randomly cry, and has difficulty remembering simple things.  (Id.)  Plaintiff rarely has a good night's sleep.  (Id. at 231.)  She is depressed, and has problems with personal care tasks.  (Id.)  Plaintiff tries to cook dinner for her daughters; they help her.  (Id. at 232.)  Ms. Meister reported that Plaintiff "needs help with just about everything."  (Id.)  Plaintiff can not carry the laundry up and down the stairs and has difficulties with mopping and vacuuming.  (Id.)  If she is having a "painful day," she sleeps.  (Id. at 233.)  Plaintiff only goes outside when necessary.  (Id.)  She has panic attacks and takes anxiety medication.  (Id.)  If she takes her

anxiety medication, she can go out alone.  (Id.)  Plaintiff shops for groceries and other necessary items.  (Id.)  Before her impairments, Plaintiff was very active, went places with her children, and had family dinners.  (Id. at 234.)  Now, the only place she goes on a regular basis is to her children's school.  (Id.)  Plaintiff's impairments adversely affect her abilities to lift, sit, squat, stand, walk, bend, climb stairs, understand, follow instructions, complete tasks, remember, and concentrate.  (Id. at 235.)  She can walk for only one block before having to rest.  (Id.)  She has to have spoken instructions repeated, but can follow written instructions okay.  (Id.)  She does not handle stress or changes in routine well.  (Id. at 236.)  She wears a brace that she bought over the counter.  (Id.)

After the denial of her applications, Plaintiff completed a Disability Report - Appeal form.  (Id. at 279-86.)  Her impairments were worse.  (Id. at 280.)

The medical records before the ALJ are summarized below in chronological order, beginning with those of an emergency room visit to SSM DePaul Hospital in August 2007 for complaints of a sudden onset of sharp abdominal pain that was not exacerbated by or alleviated by anything.  (Id. at 298-309.)  She had a fever, chills, nausea, and vomiting.  (Id. at 299-301, 336.)  All other systems were unremarkable.  (Id. at 336.)  She was alert and oriented to time, place, and person.  (Id. at 300, 311.)  Computed tomography (CT) scans of her pelvis and abdomen revealed a possible gastric outlet obstruction and small nonobstructing left renal calculi (kidney stones).  (Id. at 303-04.)  Plaintiff was admitted and given intravenous medications, including antibiotics.  (Id. at 305-39.)  An upper endoscopy was normal and ruled out a gastric outlet obstruction.  (Id. at 334.)  CT scans of her abdomen

and pelvis the next day showed atelectasis with interstital infiltrate and dependent pleural effusion within both lower lobes posteriorly and small periaortic lymph nodes without bulky adenopathy. (<u>Id.</u> at 331-32.) A CT scan taken six days later showed the renal calculi present on the previous CT scan and new bilateral small pleural effusions, but ruled out abscesses and was otherwise normal. (<u>Id.</u> at 327-28, 334.) The next day, Plaintiff was discharged with prescriptions for Levaquin (an antibiotic) for fourteen days, Flagyl (an antibiotic) for fourteen days, and Vicodin (a combination of acetaminophen and hydrocodone, an opioid pain medication) to be taken as needed. (<u>Id.</u> at 334.) She was given the names of some physicians to contact as primary care physicians. (<u>Id.</u>)

On January 2, 2008, Plaintiff consulted William Irvin, Sr., M.D., for her complaints of depression. (<u>Id.</u> at 348-49.) The notes of that visit are generally illegible. (<u>Id.</u>)

Plaintiff went the emergency room at St. Mary's Hospital (St. Mary's) on January 6 with complaints of a growth on her inner left thigh and of back pain. (<u>Id.</u> at 502-11.) She reported that she had fallen on the stairs three weeks earlier and then had tripped in the yard one week earlier. (<u>Id.</u> at 504.) She was diagnosed with a strained back and left leg, given Vicodin, and, when discharged, walked with a steady gait. (<u>Id.</u> at 503, 505, 511.)

Plaintiff saw Dr. Irwin again on January 23. (<u>Id.</u> at 347.) On the checklist format of his visit notes, Dr. Irvin marked that Plaintiff was well-dressed and groomed, with speech that was regular in rate and rhythm, and thought that was logical and sequential in content. (<u>Id.</u>) Her medications were adjusted, although the only legible name is Prozac, an antidepressant. (<u>Id.</u>)

The following month, Dr. Irwin noted that Plaintiff was depressed. (Id. at 346.)

At the next, March 11 visit to Dr. Irwin, the same descriptions were checked. (Id. at 345.) Plaintiff's dosage of Lexapro, an antidepressant, was increased. (Id.)

On March 17, Plaintiff was seen at the Internal Medicine Clinic at the People's Health Center for complaints of low back pain. (Id. at 379, 381.) She reported that she had been in a car accident two weeks earlier. (Id. at 379.) On examination, she had a decreased range of motion. (Id. at 381.) She was diagnosed with chronic low back pain caused by acute lumbar spasm. (Id.) She was given Percocet (a combination of acetaminophen and oxycodone, an opioid pain medication) and Flexeril (a muscle relaxant) and was referred to physical therapy. (Id.) Also, she was to have a magnetic resonance imaging (MRI) of her lumbar spine. (Id.) She was to follow up with a psychiatrist for her complaints of anxiety and depression. (Id.)

The MRI showed a small central disc protrusion at L5-S1 and a left pelvic cyst. (Id. at 341.)

Plaintiff reported to Dr. Irvin when she saw him on March 24 that she had returned to work and had been well received. (Id. at 344.) His observations were as before. (Id.) She was to return in one week, which she did. (Id. at 343, 344.) She was struggling with depression and having difficulty at work. (Id. at 343.) Oxazepam (a benzodiazepine) and Toradol (a nonsteroidal anti-inflammatory drug (NSAID)) were added to her medications. (Id.) Dr. Irvin listed a diagnosis of 296.32, the diagnostic code for major depressive disorder,

recurrent, moderate.[6]  (Id.)  Plaintiff was referred to a therapist and was to return in two weeks.  (Id.)

Plaintiff next sought medical attention in September when she returned to the Internal Medicine Clinic for complaints of low back pain radiating down her legs.  (Id. at 382-83.)  She had moved over the weekend and no longer had insurance because she lost her job.  (Id. at 382.)  She was diagnosed with lumbar disc disease due and prescribed Percocet, Flexeril, and an unidentified NSAID.  (Id. at 383.)  She was also given samples of Lexapro for her depression.  (Id.)

The following month, Plaintiff went to the emergency room at Forest Park Hospital for complaints of low back pain for the past three days that radiated to her left leg.  (Id. at 450-60.)  Plaintiff explained that she had been in a motor vehicle accident six months earlier.  (Id. at 456.)  She had run out of her medications, which were Lexapro and Percocet.  (Id. at 451.)  Her medical history included depression and chronic back pain.  (Id.)  Plaintiff was given Toradol and Robaxin, a muscle relaxant, and was discharged with prescriptions for naproxen (an NSAID), Darvocet,[7] and Lexapro.  (Id. at 452, 458.)  She was to follow up with her primary care providers, which she did two days later when she saw the providers at Internal Medicine Clinic, complaining of pain in her low back, knees, and elbows.  (Id. at

---

[6]See Diagnostic and Statistical Manual of Mental Disorders, 860 (4th Ed. Text Revision 2000) (DSM-IV-TR).

[7]Darvocet is a combination of acetaminophen and propoxyphene, a narcotic pain reliever. See Darvocet, http://www.drugs.com/search.php?searchterm=darvocet (last visited Sept. 27, 2013).  It was withdrawn from the United States market in November 2010.  Id.

384-85, 452, 459.)  Her pain was a ten and was not being relieved by medications.  (Id. at 384.)  She was referred to Hopewell Clinic for her depression and anxiety, and was continued on Lexapro and lorazepam (a benzodiazepine).  (Id. at 385.)  She was also given a trial of gabapentin (an anticonvulsant) for her lumbar disc disease, which was attributed to polyneuropathy.  (Id.)

Plaintiff returned to the Internal Medicine Clinic in February 2009 for treatment of an urinary tract infection, back pain for the past three days, and elbow and knee pain for the past year.  (Id. at 386-87.)  She was having anxiety attacks twice a day.  (Id. at 386.)  She was given Percocet for her pain and instructed to do a program of home stretches and exercise.  (Id. at 387.)  She was also given Cipro, an antibiotic, for her urinary tract infection.  (Id.)  It was noted that she had stopped taking Lexapro on her own initiative because of side effects of confusion and fatigue.  (Id.)

The next month, Plaintiff was seen at the emergency room at Forest Park Hospital for complaints of back pain that radiated down her left leg and chest pain.  (Id. at 477-95.)  The pain had begun three to four days earlier.  (Id. at 480.)  Her only medication at the time was Lyrica (an anticonvulsant).  (Id. at 484.)  X-rays of her chest and lumbar spine were normal, with the exception of the latter showing some hypoventilation.  (Id. at 489-90.)  An electrocardiogram (EKG) was normal.  (Id. at 491.)  Plaintiff was given Robaxin, Toradol and hydrocodone.  (Id. at 482.)  When given the last medication, her pain decreased from a nine to a five.  (Id. at 482, 483.)  When speaking with a doctor, Plaintiff requested help for her "'stress problems.'"  (Id. at 483.)  She was then evaluated for a possible suicide risk.  (Id.)

When the consultation was complete, she was discharged with prescriptions for hydrocodone and Lyrica.  (Id. at 483, 485.)  She was to follow up with her primary care physician in three to five days.  (Id. at 494.)

In June, Plaintiff was admitted to Forest Park Hospital for evaluation of intractable nausea and vomiting and abdominal pain after she went to the emergency room for abdominal pain, rectal bleeding, and constipation.  (Id. at 353-74.)  CT scans of her abdomen and pelvis showed sigmoid colon diverticulosis, but not diverticulitis.  (Id. at 354, 361, 373-74.)  She was given morphine and Donnatal (belladonna alkaloids and phenobarbital) for her pain.  (Id. at 363.)  Because she could not tolerate the necessary preparation for a colonoscopy, the procedure, scheduled for June 26, could not be done.  (Id. at 354-55, 566.)  She was discharged in good condition with prescriptions for Senokot,[8] Vicodin, and Cipro.  (Id. at 354-55, 366.)

Plaintiff was seen again at the St. Mary's emergency room on August 21 for complaints of right flank pain for the past two days.  (Id. at 512-32.)  She explained that she had just moved and had done a lot of lifting.  (Id. at 513.)  Her home medications included Lyrica and lorazepam.  (Id. at 525.)  An EKG was normal. (Id. at 521-22.)  After being given Toradol and Dilaudid (hydromorphone), Plaintiff reported that the pain was gone.  (Id. at 519, 520, 523.)  She was discharged with prescriptions for Lortab (a combination of acetaminophen and hydrocodone), Zofran (an anti-nausea medication), and Cipro.  (Id. at

---

[8]Senokot is an alternative medicine used to help treat constipation.  Senokot, http://www.drugs.com/mtm/senokot.html (last visited Sept. 27, 2013).

532.)  She was instructed to call her primary care physician if she did not improve within the week.  (<u>Id.</u>)

A CT scan taken on August 22 of Plaintiff's abdomen and pelvis revealed small bilateral kidney stones.  (<u>Id.</u> at 501.)

Two days later, Plaintiff returned to the emergency room at St. Mary's.  (<u>Id.</u> at 449-50, 533-45.)  She explained that she may have hurt her back moving.  (<u>Id.</u> at 534.)  The onset was three days earlier.  (<u>Id.</u>)  It was noted that she had been in a motor vehicle accident in 1996 that had caused her back pain for two months.  (<u>Id.</u>)  Plaintiff reported that she had not been taking her pain medications, and later explained that the medications were ineffective. (<u>Id.</u> at 537, 540.)  She also reported that she was confused and had an anxiety disorder and kidney stones.  (<u>Id.</u> at 537.)  She was given Toradol and, after showing improvement, discharged home with prescriptions for Percocet and prednisone.  (<u>Id.</u> at 500.)

On week later, on August 31, Plaintiff went to the emergency room at St. Louis University Hospital for treatment of an acute exacerbation of her diverticulosis.  (<u>Id.</u> at 399-414, 438-46.)  She reported that she had abdominal pain that was a nine on a ten-point scale accompanied by vomiting.  (<u>Id.</u> at 442, 446.)  The pain had begun three days earlier.  (<u>Id.</u>) She had not previously had similar symptoms.  (<u>Id.</u> at 446.)  She was uncomfortable and anxious.  (<u>Id.</u> at 442.)  Her behavior, mood, and affect were described as being at baseline. (<u>Id.</u> at 399.)   CT scans of her abdomen and pelvis revealed sigmoid diverticulosis and bilateral renal calculi.  (<u>Id.</u> at 409-14.)  Plaintiff was treated with medication and discharged

within five hours with prescriptions for Flagyl, Cipro, and Compazine (an anti-psychotic medication). (Id. at 401, 439.)

The impression of George Pelican, M.D., following a consultation on September 2 was that Plaintiff had left lower quadrant abdominal pain and "[d]iverticulitis versus inflammatory bowel disease." (Id. at 572-73.)

On September 11, Plaintiff returned to the emergency room at St. Louis University Hospital for complaints of sharp, piercing abdominal pain that had begun two to three days earlier. (Id. at 415-37.) On arrival, Plaintiff was crying and moaning. (Id. at 416.) CT scans of her abdomen and pelvis revealed nephrolitiasis (the presence of renal calculi, or kidney stones[9]). (Id. at 432-37.) Plaintiff was treated with medication, including morphine, and discharged home in stable condition. (Id. at 424.)

Four days later, Plaintiff returned to the emergency room at Forest Park Hospital. (Id. at 461-76.) She had had abdominal pain for the past three days that was accompanied by nausea, vomiting, and diarrhea. (Id. at 463, 467.) The pain was a seven on a ten-point scale. (Id. at 467.) CT scans of her pelvis and abdomen revealed small stones in both kidneys and mild sigmoid diverticulosis. (Id. at 473-74.) She was given pain medication; discharged with a prescriptions for Percocet, lorazepam, and Lyrica; and instructed to follow up with her primary care physician. (Id. at 462, 466, 469, 476.)

Plaintiff saw Daniel Berg, M.D., with Family Care Health Centers (FCHC) on September 24. (Id. at 754.) Her left lower quadrant abdominal pain was only relieved by

---

[9]See Stedman's Medical Dictionary, 260, 261, 1183 (26th ed. 1995) (Stedman's).

taking three Vicodins at a time.  (Id.)  It was an eight on a ten-point scale.  (Id.)  Dr. Berg concluded that she needed a colonoscopy or sigmoidoscopy.  (Id.)  And, she was to be referred to an urologist for an evaluation of whether she had kidney stones.  (Id.)

Plaintiff saw Dr. Berg again on October 2.  (Id. at 563-64.)  He thought she might have irritable bowel syndrome (IBS) and referred her for a consultation by a gastroenterologist.  (Id. at 563.)  He prescribed her Xanax to be taken as needed for her anxiety.  (Id.)

The next week, Plaintiff was admitted to St. Mary's for the consultation, which included a colonoscopy and endoscopy.  (Id. at 566-70, 605-16.)  After these tests were performed, she was diagnosed with gastrointestinal bleeding, abdominal pain, and anxiety.  (Id. at 570, 612.)

Plaintiff returned to Dr. Berg on October 14, reporting that she was feeling better after taking antibiotics for two weeks for diverticulosis.  (Id. at 562.)  She continued, however, to have left lower quadrant pain that was helped, but not resolved, by Vicodin.  (Id.)  Dr. Berg prescribed Cipro and Flagyl in addition to renewing the prescription for Vicodin.  (Id.)  He also referred her to another physician, Heidi Joist, M.D., for treatment of the nephrolithiasis.  (Id.)

On October 19, Plaintiff had an initial interview with Jaron Asher, M.D., a psychiatrist at FCHC.  (Id. at 559-61.)  She reported that her husband – a paranoid schizophrenic – had committed suicide in March 2004 and her brother had died later of an overdose.  (Id. at 559.)  She had panic attacks once or twice a week and was agoraphobic.

(Id.)  Medications had helped, but she had had to stop them.  (Id.)  She would have manic phases where she would gamble and then would "crash."  (Id.)  Her appetite, sleep, energy, and concentration were all decreased.  (Id.)  Because she was not able to concentrate, she could not keep a job.  (Id. at 560.)  Dr. Asher prescribed her Seroquel and Xanax, with enough of the latter to last her until her next appointment.  (Id. at 561.)

Plaintiff telephoned FCHC two days later, requesting a refill of her prescriptions and explaining that she had had a burglary at her house.  (Id. at 557.)  The physician on duty, David Glick, M.D., declined to provide them.  (Id.)

On November 4, Plaintiff had an initial interview with Rocky Sieben, L.C.S.W.  (Id. at 553-55, 710-12.)  Her chief complaints were of depression and anxiety.  (Id. at 553.)  In addition to explaining about her husband and brother, Plaintiff reported that she was arrested on outstanding warrants in February 2009, served a month in jail, and is on probation for two years.  (Id.)  She had used alcohol to deal with her problems. (Id.)  She had previously tried therapy, but was not then trying to get better.  (Id.)  Her current psychiatric medication was Seroquel.  (Id.)  She had been fired last year and had applied for disability.  (Id. at 554.)  Her father was an alcoholic and in Alcoholics Anonymous; her mother was depressed; her grandmother was bipolar.  (Id.)  She was having difficulty sleeping, was irritable, and had frequent panic attacks.  (Id. at 555.)  On examination, Plaintiff was well dressed; well groomed; had a normal rate and volume of speech; had a goal-directed and logical flow of thought; and was alert and oriented to person, place, and time.  (Id. at 554.)  Her mood and affect were depressed.  (Id.)  She was thought to have bipolar disorder and post-traumatic

stress disorder (PTSD). (Id. at 555.) Mr. Sieben opined that her current Global Assessment of Functioning (GAF) was 51.[10] (Id.)

Two days later, Plaintiff had a follow-up appointment with Dr. Asher. (Id. at 556.) She was given nonrefillable prescriptions for Xanax and Vicodin. (Id.)

On November 11, Plaintiff brought to FCHC a copy of the police report indicating that her Xanax had been stolen. (Id. at 552, 709.) Regardless, Dr. Asher declined to give her another prescription until her November 25 appointment. (Id.)

Plaintiff was seen again at the Forest Park Hospital emergency room on November 16. (Id. at 654-661, 724.) She complained of low back, abdomen, and right flank pain. (Id. at 655.) The back pain radiated to both legs. (Id.) On a scale of one to ten, the pain was a ten. (Id. at 658.) A CT scan was within normal limits. (Id. at 724.) Plaintiff was prescribed Motrin, Percocet, Skelaxin, and Xanax. (Id. at 661.)

Three days later, Plaintiff was seen by Elizabeth Keegan-Garrett, M.D., with FCHC for her complaints of back pain. (Id. at 707-08.) On examination, straight leg raises were negative bilaterally,[11] although Dr. Keegan-Garrett noted that Plaintiff stated that she felt

_____

[10]"According to the [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

[11]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life**

pulling in her low back area after her legs were approximately one inch off the table. (Id. at 707.) She also noted the normal results of the CT scan performed three days earlier. (Id.) There was no clubbing, cyanosis, or edema in Plaintiff's lower extremities. (Id.) She had 2/5 strength in those extremities but could ambulate without difficulty. (Id.) Plaintiff reported that she only had five pills of Vicodin left and was given a nonrenewable refill. (Id.) Dr. Keegan-Garrett's diagnosis was of "likely low back strain." (Id.)

When seeing Dr. Asher on November 25, Plaintiff described a renewed reaction to the loss of her husband and brother. (Id. at 705.) She reported that she was having to take more Xanax than he had prescribed. (Id.) She was started on Cymbalta (an anti-depressant) and Vistaril. (Id.) Her dosage of Seroquel was increased. (Id.) Dr. Asher discontinued the Xanax "as the risk of abuse [was] too high." (Id.)

Dr. Joist saw Plaintiff on December 2 and ordered a kidney stone evaluation, for which Plaintiff was to twice collect her urine. (Id. at 652-53.) When seeing Plaintiff for her follow-up appointment six weeks later, Dr. Joist noted that Plaintiff had not collected her urine; hence, the stone evaluation was not done. (Id. at 651.) The labs were reordered, and Plaintiff was to return after the stone risk factor analysis was done. (Id.)

Plaintiff saw Dr. Berg on December 11 and reported that the only thing that helped her non-stop abdominal and back pain was Vicodin. (Id. at 703.) Dr. Berg described himself as being at a loss as to what was causing her abdominal pain. (Id.) She was to be referred to another physician. (Id.)

Assur. Co. of Boston, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

Plaintiff did not keep her December 14 appointment with Mr. Sieben.  (<u>Id.</u> at 704.)

Plaintiff returned on January 2, 2010, to the emergency room at St. Mary's with complaints of bloody diarrhea and left lower quadrant abdominal pain.  (<u>Id.</u> at 617-32.)  It was noted that Plaintiff had had "multiple" CT scans of her abdomen and pelvis and had been ultimately diagnosed with IBS.  (<u>Id.</u> at 617.)  On examination, she was not in distress and had a normal mood, memory, affect, and judgment.  (<u>Id.</u> at 618.)  She was alert and oriented.  (<u>Id.</u>)  X-rays of her abdomen and chest were normal.  (<u>Id.</u> at 622.)  The diagnosis was again IBS.  (<u>Id.</u> at 620.)  She was discharged with prescriptions for Naproxen, cyclobenzaprine, oxycodone with acetaminophen, clonazepam, and famotidine.  (<u>Id.</u> at 625.)  She was also instructed on a diet appropriate for IBS.  (<u>Id.</u> at 630-32.)

Two days later, Plaintiff reported to Dr. Asher that her depression and panic attacks were worse.  (<u>Id.</u> at 701-02.)  He told her she needed weekly therapy sessions – a schedule Mr. Sieben could not accommodate – and referred her to another therapist.  (<u>Id.</u> at 702.)  He continued her on Cymbalta, stopped the Vistaril, described by Plaintiff as being of no help, and added Buspar, an anti-anxiety medication.  (<u>Id.</u>)

On January 21, Plaintiff consulted Dr. Berg about sharp pains in the left lower quadrant of her abdomen and blood in her stools.  (<u>Id.</u> at 700, 714.)  These problems had begun five days earlier.  (<u>Id.</u>)  Vicodin helped, but did not relieve the pain.  (<u>Id.</u> at 700.)  Dr. Berg prescribed Cipro and Flagyl.  (<u>Id.</u>)

Four days later, Plaintiff reported to Dr. Berg that she was waking up at night with her chest covered in sweat.  (<u>Id.</u> at 699.)  She had been taking Cipro and Flagyl, neither was

helping relieve her abdominal pain. (Id.) Three days later, Plaintiff again consulted Dr. Berg after she fell down some stairs and hurt her wrist. (Id. at 696.) She was given an injection of Toradol. (Id.)

Plaintiff saw Dr. Asher on February 1, reporting that her depression and panic attacks were "a little better." (Id. at 695.) She had run out of Cymbalta one week earlier. (Id.) Her speech was normal; her affect was less depressed and anxious. (Id.) The diagnosis was depression and anxiety, not otherwise specified (NOS).[12] (Id.) Her prescriptions were renewed. (Id.) She was to return in two months. (Id.) She cancelled her appointment with Mr. Sieben for that day. (Id. at 697.)

On February 18, Plaintiff returned to the Forest Park Hospital emergency room for treatment of left groin pain, mid-low back pain, bloody stools, and a nose bleed. (Id. at 662-69.) The pain was a seven on a ten-point scale. (Id. at 666.) After being treated with Toradol, the pain decreased to a five. (Id. at 667.) Plaintiff was discharged with instructions to follow-up with her primary care physician. (Id. at 669.)

On March 8, Plaintiff was seen again at the St. Mary's emergency room. (Id. at 633-48, 720-23.) She had severe low back pain and trouble walking. (Id. at 633, 636.) The pain

---

[12]According to the DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category. DSM-IV-TR at 4. This category may be used in one of four situations: (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class. Id.

was a seven on a ten-point scale.  (<u>Id.</u> at 633.)  It was described as a "new problem."  (<u>Id.</u>)  There were no accompanying psychiatric symptoms.  (<u>Id.</u> at 634.)  It was noted that the "exact details chang[ed] from interviewer to interviewer."  (<u>Id.</u> at 636.)  She was given Ativan, which did not help, and then Vicodin, which made her lethargic.  (<u>Id.</u> at 635.)  She requested, and was given, Percocet; the nurses noticed no changes in her behavior with the Percocet.  (<u>Id.</u> at 643.)  "Her neuro exams were complex in part based on [her] lack of effort to her entire neuro exam."  (<u>Id.</u>)  A neurologist, Dr. Alison Leston, concluded that the exam was "reassuringly normal," as was the lab work.  (<u>Id.</u>)  MRIs of her thoracic, cervical, and lumbar spine were all unremarkable.  (<u>Id.</u> at 720-23.)  Plaintiff requested Xanax for her anxiety, explaining that it had helped in the past, and stated that she would return to her psychiatrist for treatment of her bipolar illness.  (<u>Id.</u> at 642.)  Her diagnoses on discharge the next day included back pain, depression, anxiety, and conversion disorder.  (<u>Id.</u> at 633, 642.)  She had been depressed since her husband had committed suicide in 2004.  (<u>Id.</u> at 642.)

Six days later, on March 15, Plaintiff saw Dr. Berg, reporting that her back, leg, and abdominal pain were all worse since her discharge.  (<u>Id.</u> at 691-94.)  She also reported that the Flexeril and Naproxen she had been given had not helped; the Percocet she had been given made her itch and she did not like it.  (<u>Id.</u> at 691.)  She asked for a "high dose Hydrocodone which helped her in the past."  (<u>Id.</u>)  Dr. Berg opined that "her psychiatric issues [were] greatly exacerbating her medical issues."  (<u>Id.</u> at 692.)  He recommended that she exercise, and gave her a script for a YMCA Fit for Life program.  (<u>Id.</u>)  He also gave her 30 tabs of Norco (a combination of acetaminophen and hydrocodone) and a sheet on back

stretches.  (Id.)  He predicted that the back pain would get better in four to six weeks.  (Id.)
He reassured her that the diagnostic tests had failed to reveal any abdominal pain or stool
problem other than mild diverticulosis and that there was nothing seriously wrong with her.
(Id.)

Plaintiff saw Dr. Asher on March 22, reporting that she had been admitted to St.
Mary's when she was unable to move her legs and had been diagnosed with conversion
disorder.  (Id. at 687-89.)  She further reported that Cymbalta had helped initially, but no
longer was.  (Id.)  Her prescriptions for Cymbalta, Seroquel, and clonazepam were renewed;
a prescription for mirtazapine was added.  (Id.)  She was to return in two weeks "due to being
in crisis."  (Id.)  Dr. Asher noted that Plaintiff "had not made it in to see" Mr. Sieben and
arranged for a brief meeting between the two that day.  (Id. at 687-88.)

The next day, Plaintiff was given a refill of her prescription for Norco when she
contacted FCHC and reported that her rectum and back pain were still bad.  (Id. at 686.)

Plaintiff saw Dr. Asher on April 12, requesting that she be prescribed an
antidepressant of which she could be given a sufficient number of samples.  (Id. at 684.)  She
wanted to try Prozac, explaining that it had "worked best for her in the past."  (Id.)  The
mirtazapine was discontinued due to side effects.  (Id.)  She was to return in two weeks.  (Id.)
The same day, she contacted Dr. Berg, reporting that she had been up all that night because
of a burning sensation in her knees and elbows and pain in her right lower quadrant and
back.  (Id. at 682.)  She had had the same problem for one to two months two years earlier.
(Id.)  She was given a one-time refill for Norco and instructed to make an appointment.  (Id.)

Plaintiff informed Mr. Sieben the next day that she continued to grieve the loss of her husband and brother. (<u>Id.</u> at 681.) She had difficulty moving forward. (<u>Id.</u>) Her mood and affect were described by Mr. Sieben as depressed, anxious and irritable. (<u>Id.</u>) He noted that she walked slowly. (<u>Id.</u>) He listed her diagnoses as major depressive disorder, recurrent; general anxiety; and somatization. (<u>Id.</u>)

The next day, Plaintiff told Dr. Berg that she was going to start the Fit for Life program with a personal trainer. (<u>Id.</u> at 680.) She had pain in her elbows and knees that was the worst she had ever had and which was not relieved by medications. (<u>Id.</u>) She was given a shot of Toradol. (<u>Id.</u>)

X-rays of Plaintiff's chest and an ultrasound of gallbladder were taken on April 22 and were negative. (<u>Id.</u> at 715-16.)

Plaintiff saw Dr. Asher and Mr. Sieben separately on April 26. (<u>Id.</u> at 675-77.) To Dr. Asher, she reported that she "ha[d] not been wholly honest." (<u>Id.</u> at 675.) A trigger to her recent admission to St. Mary's was a manic episode where she had run up her mother's credit card. (<u>Id.</u>) She had manic episodes once or twice a year for three to four days each. (<u>Id.</u>) Her speech was normal; her affect was less depressed and anxious; her thoughts were clearer and more goal directed. (<u>Id.</u>) Dr. Asher diagnosed Plaintiff with depression; anxiety, NOS; probable bipolar disorder; history of alcohol abuse; and recent diagnosis of conversion disorder. (<u>Id.</u>) He opined that she had a "heavy use of somatization." (<u>Id.</u>) Her GAF was

49.[13] (Id.) Her Cymbalta dosage was to be decreased in anticipation of it being discontinued if Plaintiff was found to have bipolar disorder. (Id.) She was continued on Seroquel and clonazepam. (Id.) Plaintiff described to Mr. Sieben the episode where she had run up her mother's credit card bill. (Id. at 676.) She reported that she felt better and more in control on her current medications. (Id.)

Plaintiff saw Dr. Berg three days later for abdominal and back pain. (Id. at 677.) She informed him that there were no side effects from the Tylenol #3 she was taking, but she hd to take at least two pills to relieve her pain. (Id.) Dr. Berg referred Plaintiff to Washington University for pain management and injections. (Id. at 671, 677.)

Plaintiff saw Mr. Sieben again on May 12. (Id. at 672.) She reported that her mother was not speaking to her after she ran up her mother's credit card bill. (Id.) Plaintiff was ready to try new medication. (Id.) Her mood and affect were calm; her speech was normal; her flow of thought was organized and goal-directed; and her insight and judgment were fair. (Id. at 672.) Mr. Sieben rated her GAF as 50 and recorded her diagnoses as bipolar and conversion disorders. (Id.) He was to discuss with Dr. Asher a change in medication at Plaintiff's next appointment. (Id.) Dr. Asher saw Plaintiff the same day, noting that she wanted to stop the Cymbalta and try Lamictal. (Id. at 673.) Dr. Asher also noted Plaintiff's

---

[13]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

report that she "has been on antidepressants all her live" and that this was a consideration in the diagnosis of bipolar.  (Id.)

Plaintiff did not keep her next, May 26 appointment with Mr. Sieben.  (Id. at 670.)

She was seen that same day, however, at the Pain Management Center for Washington University School of Medicine.  (Id. at 725-49.)  On an intake questionnaire, Plaintiff reported that she had had lower back pain since an accident in 2005 when the van she was driving rolled over eight times.[14]  (Id. at 730.)  On a questionnaire asking her to rate how her pain affects her daily living activities, Plaintiff reported that, on a scale of one to ten, the pain was an eight, i.e., it was greatly interfering with those activities and was very severe.  (Id. at 731.)  Presently, her pain was a seven; at its worst, it was a ten; at its least, it was a five; and, on average, it was a seven.  (Id.)  It was constant.  (Id. at 732.)  The only thing that made it better was medication.  (Id.)  Walking, lifting, bending, weather changes, standing, stress, a light touch, and strain all made it worse.  (Id.)  Lying down and sitting neither made it better nor worse.  (Id.)  Asked to describe how her pain affected various activities, Plaintiff checked the box labeled "Extremely" for going to work, performing household chores, doing yard work, shopping, engaging in hobbies or recreational activities, exercising, sleeping, and eating.  (Id. at 734.)  Socializing and engaging in sex affected the pain "Quite a bit."  (Id.)  Asked what symptoms she currently had, Plaintiff marked the boxes for fatigue, weight loss, poor appetite, muscle pain, abdominal pain, constipation, headache,

---

[14]Plaintiff informed the physician, Rahul Rastogi, M.D., that the vehicle had rolled over fifteen times and that the brother she was driving with had later died from his injuries. (Id. at 747.)

- 26 -

weakness/numbness/tingling, depression, sweating, loss of coordination, and anxiety/panic attacks. (Id. at 735.) She took Tylenol #3 five times a day for pain relief; Seroquel at night; and clonazepam three times a day. (Id. at 736.) She reported that she frequently was anxious, depressed or discouraged, and irritable or upset. (Id. at 737.) Plaintiff was given a lumbar transforaminal epidural steroid injection (selective nerve root injection) at the left of L4-L5 and L5-S1. (Id. at 738-39.) On discharge in stable condition, she was instructed to take one capsule of gabapentin at night for three days and then take an additional capsule every third day until she was taking two capsules three times a day. (Id. at 726, 739, 748.) Also, she was to follow-up with physical therapy and was given a referral to a rehabilitation clinic for a minimum of a couple of visits. (Id. at 743, 748.)

Various assessments of Plaintiff's functional capacities, physical and mental, were also before the ALJ.

In December 2009, Kevin Threlkeld, a non-examining medical consultant, completed a Physical Residual Functional Capacity Assessment of Plaintiff. (Id. at 92-97.) The primary diagnoses were lumbar degenerative disc disease with intermittent sciatica; sigmoid diverticulosis with intermittent diverticulitis; the secondary diagnosis was polyarthralgia. (Id. at 92.) Plaintiff was assessed as having exertional limitations of occasionally lifting and carrying twenty pounds; frequently lifting and carrying ten pounds; and sitting, standing, or walking about six hours in an eight-hour workday. (Id. at 93.) Her ability to push and pull was limited in her lower extremities. (Id.) She had postural limitations of never climbing ladders, ropes, or scaffolds and only occasionally balancing, stooping, kneeling, crouching,

crawling, and climbing ramps and stairs.  (Id. at 94.)  She had no manipulative, visual, communicative, or environmental limitations.  (Id. at 94-95.)

The same month, Kyle DeVore, Ph.D., also a non-examining medical consultant, assessed Plaintiff's mental functioning abilities and limitations.  (Id. at 574-87.)  On a Psychiatric Review Technique form (PRTF), Dr. DeVore assessed her as having an affective disorder, i.e., depression, and an anxiety-related disorder, i.e., anxiety.  (Id. at 574, 577, 578.)  These disorders resulted in mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 582.)  They did not cause any episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment, Dr. DeVore assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two.  (Id. at 585.)  In the area of sustained concentration and persistence, she was moderately limited in three of seven listed abilities, i.e., carrying out detailed instructions; maintaining attention and concentration for extended periods; and completing a normal workday and workweek without interruptions from psychologically-based symptoms.  (Id. at 585-86.)  She was not significantly limited in the remaining four abilities.  (Id. at 585.)  In the area of social interaction, Plaintiff was moderately limited in one of the five abilities, i.e., the ability to accept instructions and respond appropriately to criticism from supervisors, and was not significantly limited in the remaining four.  (Id. at 586.)  In

the area of adaptation, Plaintiff was moderately limited in two abilities, i.e., responding appropriately to changes in the work setting and setting realistic goals or making plans independently of others. (<u>Id.</u>) She was not significantly in the remaining two abilities. (<u>Id.</u>)

In June 2010, Dr. Asher completed an Assessment for Social Security Disability Claim and an Assessment of Ability to Do Work-Related Activities (Mental). (<u>Id.</u> at 750-52.) In the former he summarized her clinical history; described her current symptoms, including those present in her manic phases, e.g., decreased sleep and increased activity, and in her more-frequent depressed phases, e.g., hopelessness and lack of motivation; noted that she had symptoms of bipolar disorder and that the diagnosis of conversion disorder given her when she was in the hospital was now thought to be triggered by a manic episode; and opined that Plaintiff could not engage in sustained, full-time competitive employment. (<u>Id.</u> at 750.)

In the other assessment, Dr. Asher marked that Plaintiff had "poor or none" abilities to make seven of the eight abilities listed under the category of making occupational adjustments. (<u>Id.</u> at 751.) She had a "fair" ability to use judgment. (<u>Id.</u>) She had a "fair" ability in one of the three activities, i.e., understanding, remembering, and carrying out simple job instructions, listed under the category of making performance adjustments and "poor or none" abilities in the other two activities. (<u>Id.</u>) In the category of making personal-social adjustments, she had a "fair" ability in two of the four activities and "poor or none" in the other two. (<u>Id.</u>)

Mr. Sieben also completed an Assessment of Ability to Do Work-Related Activities (Mental) on behalf of Plaintiff. (Id. at 753.) His assessment differed from that of Dr. Asher only in the category of making personal-social adjustments. (Id. at 753.) Whereas Dr. Asher had rated Plaintiff's ability to maintain her personal appearance as "fair," Mr. Sieben rated it as "good." (Id.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act as of December 31, 2014, and had not engaged in substantial gainful activity since her allege disability onset date of November 30, 2008. (Id. at 14.)

The ALJ next found that Plaintiff had severe impairments of depression, anxiety, lumbar degenerative disc disease, and polyarthralgia. (Id.) After summarizing the medical evidence, the ALJ addressed the assessments of Dr. Asher and Mr. Sieben. (Id. at 15-17.) He declined to give either any weight because they were inconsistent with the evidence as a whole, and, insofar as Dr. Asher and Mr. Sieben opined about Plaintiff's ability to maintain competitive employment, they invaded an area reserved to the Commissioner. (Id. at 17.) The ALJ described the medical record as being "significant for [Plaintiff] going from one provider to the next rather than receiving her treatment and medications from one main provider." (Id. at 14.)

The ALJ concluded that Plaintiff's severe impairments did not meet or medically equal an impairment of listing-level severity. (Id. at 18.) Her mental impairments did not satisfy the criteria of either Listing 12.04 (affective disorders) or 12.06 (anxiety-related disorders).

- 30 -

(Id.) Specifically, she had only mild restrictions in her activities of daily living and moderate difficulties in maintaining social functioning. (Id.) She had moderate difficulties in maintaining concentration, persistence, or pace. (Id.) She did not have any repeated episodes of decompensation, each of extended duration. (Id.)

Plaintiff had, the ALJ concluded, the residual functional capacity (RFC) to perform light work except she was (1) limited to only occasional stooping, kneeling, crouching, crawling, and climbing ramps and stairs, and (2) precluded from climbing ladders, ropes, or scaffolds. (Id.) Also she could (a) understand, remember, and carry out at least simple instructions and non-detailed tasks; (b) maintain concentration and attention for a two-hour segment over an eight-hour period; (c) respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; and (d) perform repetitive work according to set procedures, sequence, or pace. (Id.)

When assessing Plaintiff's RFC, the ALJ evaluated her credibility. (Id. at 19-20.) He found her not to be "entirely credible" based on several considerations. (Id. at 19.) One such consideration was her daily activities, which the ALJ first described as "a fairly sedate lifestyle" pursuant to Plaintiff's choice ant then listed as detractors from her credibility caring for her daughters, cooking, doing laundry with help, leaving her home when needed, going out alone without assistance, and shopping for hers and her daughters' needs. (Id. at 20.) He found these specific activities to be inconsistent with her subjective complaints. (Id.)

He next found that there was no evidence that her mental impairments resulted in marked severe limitations for at least twelve months. (Id.) Also detracting from her

credibility was her failure to be "diligent in following up on her treatment."  (Id.)  Her diagnosis of conversion disorder "len[t] itself to exaggerated complaints."  (Id.)

The ALJ found that Plaintiff, although not a drug addict, "ha[d] engaged in drug-seeking behavior," requesting pain medications from different sources and going to emergency rooms with various pain complaints after being denied prescriptions refills.  (Id.)  The ALJ considered this behavior also as detracting from Plaintiff's credibility.  (Id.)

The ALJ next summarized the findings of the two non-examining medical consultants and concluded that those findings were "considered expert opinion on the issue of [Plaintiff's] medical capabilities and limitations."  (Id. at 21.)

With her RFC, however, Plaintiff could not return to her past relevant work.  (Id.)  With her RFC, age, education, and transferable work skills, she could perform other jobs as described by the VE.  (Id. at 21-22.)

For the foregoing reasons, Plaintiff was not disabled within the meaning of the Act.  (Id. at 22.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).

Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.1520(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523. "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski, 739 F.2d at 1322). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to any past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).

## Discussion

Plaintiff argues that the ALJ erred by failing to consider her somatoform disorder as a severe impairment, failing to properly consider the opinion evidence of Dr. Asher and Mr. Sieben, and failing to fairly and fully develop the record. For the reasons set forth below, the decision of the Commissioner will be reversed and remanded.

In addition to severe physical impairments of lumbar degenerative disc disease and polyarthralgia,[15] the ALJ found Plaintiff had severe mental impairments of depression and anxiety. Other than referring to Dr. Asher's notation that Plaintiff had a "heavy use of depression," see Record at 675, the ALJ did not discuss Plaintiff's diagnosis of somatization.

The DSM-IV-TR provides that "[t]he essential feature of Somatization Disorder[16] is a pattern of recurring, multiple, clinically significant somatic complaints." DSM-IV-TR at 486 (footnote added). "A somatic complaint is considered to be clinically significant if it results in medical treatment (e.g., the taking of medication) or causes significant impairment in social, occupational, or other important areas of functioning."[17] Id. "The multiple somatic complaints cannot be fully explained by any known general medical condition or the direct effects of a substance." Id. There must be a history of pain related to at least four different sites or functions; of at least two gastrointestinal symptoms other than pain; and, in women, of at least one sexual or reproductive symptom. Plaintiff delineates in her supporting brief the symptoms noted in her medical record which satisfy these various criteria. For instance, Plaintiff's continuing complaints of low back, knee, elbow, abdominal, and right flank pain support a finding she had pain in at least four different sites. Her history of constipation and

---

[15]Polyarthralgia is pain in many joints. See Stedman' at 149, 1401.

[16]Plaintiff focuses her arguments on somatoform disorder. Although the two share some similar characteristics, this is a separate disorder from somatization disorder. See DSM-IV-TR at 490-92.

[17]The Court notes that the somatic complaints must begin before age 30 and occur over a period of several years. Id. There is evidence in the record that would support such a finding in Plaintiff's case.

bloody stools satisfy the gastrointestinal-symptoms requirement. And, the medical records routinely include her history of a hysterectomy.[18]

The DSM-IV-TR also provides that individuals with somatization disorder "usually describe their complaints in colorful, exaggerated terms, but specific factual information is lacking." Id. Plaintiff's failure to give consistent factual information was noted at least twice in the medical records. "They often seek treatment from several physicians concurrently, which may lead to complicated and sometimes hazardous combinations of treatments." Id. Plaintiff's pattern of seeking such treatment was noted by the ALJ, but only in the context of detracting from her credibility. "Prominent anxiety symptoms and depressed mood are very common and may be the reason for being seen in mental health settings." Id. at 486-87. "Frequent use of medications may lead to side effects and Substance-Related Disorders." Id. at 487. Again, the ALJ noted Plaintiff's frequent use of medications, but only in the context of it reflecting drug-seeking behavior. In a person with somatization disorder, "[p]hysical examination is remarkable for the absence of objective findings to fully explain the many subjective complaints of individuals . . . . These individuals may be diagnosed with so-called functional disorders (e.g., irritable bowel syndrome)." Id. The record is replete with the absence of objective findings on diagnostic tests that Plaintiff's various health care providers deemed necessary in response to her symptoms. The record also includes diagnoses of such disorders as IBS. Additionally, "[i]ndividuals with Mood Disorders, particularly Depressive Disorders, may present with somatic complaints, most commonly headache, gastrointestinal

---

[18]See e.g. R at 453, 611.

disturbances, or unexplained pain." Id. at 489 (emphasis omitted). Individuals with somatization disorder will have recurrent physical complaints throughout their lives, whereas the physical complaints of individuals with depressive disorders usually occur when they are depressed. Id.

In the instant case, Plaintiff's treating psychiatrist referred to Plaintiff having "a heavy use of somatization" and her therapist listed in a diagnosis of somatization disorder.[19] The features of this disorder are consistent with the other evidence of record. Yet, the ALJ failed to discuss the disorder and dismissed his assessment of her mental abilities to function as being inconsistent with the record. Cf. **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) ("A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'") (quoting 20 C.F.R. § 404.1527(d)) (alteration in original). If, however, Plaintiff has somatization disorder, there is no inconsistency.

Moreover, the Court notes that considerations found by the ALJ to be detracting from Plaintiff's credibility, e.g., her use of different physicians and of medications, are consistent with a diagnosis of somatization disorder.

---

[19]The Court notes that, contrary to Plaintiff's argument, see her Brief at 11, Mr. Sieben did not attribute the limitations he described in his assessment to somatoform disorder. The diagnoses he listed were bipolar disorder and conversion disorder. Regardless, given the evidence in the record that she has been diagnosed with somatization disorder, this mischaracterization is of no consequence.

Additionally, the Court notes that the ALJ considered the assessment of the non-examining consultant of Plaintiff's mental capabilities and limitations as an "expert opinion." (R. at 21.) The assessment, however, was completed months before Plaintiff's diagnosis of a somatization disorder.

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2005). "There is no bright line indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." **Mouser v. Astrue**, 545 F.3d 634, 639 (8th Cir. 2008).

In the instant case, the ALJ had before him evidence of a diagnosis that was consistent with the medical record. Her treating psychiatrist referred to her use of somatization; her therapist, a licensed clinical social worker, listed the diagnosis of somatization disorder. Although Mr. Sieben is not an acceptable medical source, see 20 C.F.R. §§ 404.1513(a), 416.913(a) (listing such sources), his diagnosis is supported by Dr. Asher's reference to somatization. Given these references and their relevance to the record and to Plaintiff's credibility, the ALJ failed in his duty to develop the record by not sending Plaintiff for a consultative psychological examination.

**Conclusion**

The ALJ's failure to address the question whether Plaintiff has somatization disorder reflects a failure to fully and fairly develop the record. Accordingly, the case will be reversed and remanded for further proceedings as discussed above. Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  30th  day of September, 2013.